**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RYAN WILSON and KASANDRA WILSON**, *his wife*, | ) ) ) |
| **Plaintiffs,** | ) **2:13-cv-1326** |
| v. | ) ) |
| **SAINT-GOBAIN UNIVERSAL ABRASIVES, INC.,** | ) ) ) |
| **Defendant.** | ) ) |

## MEMORDANDUM OPINION

Pending before the Court is the MOTION TO EXCLUDE OPINION TESTIMONY OF MICHAEL M. ELLIS AND FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56 (ECF No. 24) filed by Saint-Gobain Universal Abrasives, Inc. ("Defendant"). Defendant filed a BRIEF IN SUPPORT (ECF No. 26), accompanied by a concise statement of material facts ("CSMF") (ECF No. 27). Ryan Wilson and Kasandra Wilson ("Plaintiffs") filed a BRIEF IN OPPOSITION (ECF No. 34) to Defendant's motion, accompanied by a responsive CSMF (ECF No. 35). Defendant filed a REPLY BRIEF (ECF No. 36). The motion is ripe for disposition.

**I.      Background**

**A.      Facts**

This would be a relatively straightforward product liability case, were it not for the fact that the product at issue – a grinding wheel manufactured by Defendant – has been destroyed, leading both sides to cry "spoliation." Wilson was employed as a flash grinder at TMK IPSCO's ("TMK") facility in Ambridge, Pennsylvania. His job was to grind imperfections, or flash, from pipes manufactured by TMK, using an air powered grinding machine ("grinder") onto which the subject grinding wheel was mounted. On February 27, 2012, Wilson was allegedly injured when the wheel attached to his grinder suddenly broke, causing the grinder to recoil into his

1

midsection.

The grinding wheel at issue – a 6 inch, Norzon Type 11 wheel – is an abrasive, resin-bonded, tapered cup wheel with threaded bushing, which is the piece that allows the wheel to be mounted onto the grinder. This type of wheel has been specifically made by Defendant for TMK since 2003. The wheel was designed to be used at up to 6,000 RPM, though the grinders used by TMK's employees experienced air pressure problems and operated at about half that rate.

Defendant manufactures millions of grinding wheels each year, thousands of which are purchased by TMK. The wheels are manufactured in batches of about 250 wheels, which are known as "lots." According to Defendant, each wheel is speed tested at 1.5 times the maximum operating speed (i.e., 9,000 RPM) prior to shipment to customers.[1]

TMK purchases the wheels through a distributor, Huston Group ("Huston"), based in New Castle, Pennsylvania. During shipment, the wheels are packed in boxes, each of which contains five wheels separated by cardboard inserts. The boxes are stacked on pallets and then shrink-wrapped in plastic. Upon arrival at Huston's facility, the boxes are removed from the pallets, inspected, re-stacked on pallets, re-wrapped in plastic, and then stored until TMK places an order. Once an order comes in, the wheels are shipped on the shrink-wrapped pallets from Huston's facility to TMK's plant, where they are kept in a storage room until needed. At that point, the wheels are taken out of their boxes in small quantities – 15 to 20 wheels at a time – and stored on a table near the area where the grinding is performed. The wheels are removed from their boxes by TMK's employees, who are told to inspect them before putting them to use and to discard any with cracks, deformities, or other issues.

---

1. Plaintiffs dispute whether each and every wheel is speed tested prior to shipment. However, aside from the fact that previous lots of wheels purchased by TMK contained issues with their threading, they have not pointed to any evidence to cast doubt on Defendant's claim that all wheels are speed tested before leaving Defendant's facility.

On the date of the incident, Wilson was wearing a protective hood, gloves, chest protector, leg protectors, and safety glasses. He had been grinding for several hours with the same wheel whenever he decided it had become worn and needed to be changed. To that end, he left his workstation, took the used wheel off the grinder, and discarded it. Next, he inspected the subject wheel for cracks and, without incident, threaded it onto the grinder. Wilson also tested the subject wheel in a test box, revving it up to full RPMs. Then, he went back to grinding, and as soon as the subject wheel made contact with the pipe, he felt the grinder kick back and hit him near the stomach. The force of the blow caused him to bend over. The wheel had broken into two pieces, and a piece came off and struck plaintiff in the wrist, though it did not pierce through Plaintiff's protective gloves. That same piece or another piece severed the chain of the harness Plaintiff was wearing to hold the grinder in place while in use. After the incident, Plaintiff pulled a "whistle" to alert his supervisor about what had occurred, and then lay down on a nearby table. At some point thereafter, he was taken to the emergency room at Allegheny General Hospital, where he was diagnosed with an abdominal and lower back injury. He has since been diagnosed with a herniated disc and aggravation of stenosis in his lumber spine, allegedly as a result of the incident.

The next day, Dave Cindrich, TMK's plant supervisor, contacted Tom Jacobs, Huston's representative for Defendant, and told him about the incident. Either that same day or the following day, Cindrich also contacted Bernard Curran, Defendant's regional sales representative, to tell him what had occurred. Cindrich told Curran that there was an employee involved in the incident, but he did not tell him that there was a personal injury because TMK was not sure at the time whether Plaintiff had, in fact, been injured. Subsequent conversations between Cindrich and Curran confirmed that TMK did not believe there was personal injury at

the time. TMK did, however, complete an "Employee Medical Report" following the incident. *See* Pls.' Ex. 4, ECF No. 35-4. It was also generally known around TMK's plant that Plaintiff had been injured.

After consulting with Curran, TMK isolated the remaining wheels in the lot from which the subject wheel had originated. Curran eventually came to TMK's plant, took possession of the remaining pieces of the subject wheel, and returned it to Huston's New Castle facility, where it was repackaged and sent back to Defendant's facility in Massachusetts. Curran also sent photographs of the broken wheel to Defendant's safety engineer, who suggested to Curran that it looked like the failure had resulted from an "insert problem." The 15 remaining wheels from the lot from which the broken wheel originated, along with 250 wheels from a separate lot, were also returned to Defendant.

Once the broken wheel was returned to Defendant, it was tested and presented to a wheel jury, comprised of a quality technician, a product manager and a product safety engineer, which reviewed the test results and attempted to determine a probable cause of the breakage. Based on the results of the testing, the wheel jury concluded that the failure was "likely" caused by mishandling before it was mounted to the grinder. After 60 days, the wheel was destroyed in accordance with Defendant's retention policies.[2] The other 15 wheels from the same lot as the subject wheel were also destroyed.

**B.     Procedural History**

Plaintiffs initiated this action by filing a Complaint in the Court of Common Pleas of

---

2.      Dr. Thomas Service, P.E., the Director of Defendant's World Product Safety Department, testified that if a personal injury is reported in relation to a wheel failure, the wheel fragments are retained for several years under the company's "document retention policy." Service Dep. at 44-47, ECF No. 35-1. If, however, there is no report of a personal injury, the wheel fragments are discarded soon after they are tested. *Id.* Dr. Service testified that Defendant's policy is not in writing, but it "has just been the way it has been for basically forever." *Id.* at 159.

Allegheny County on August 14, 2013. In the Complaint, Wilson alleges claims for strict product liability; negligence; and breach of the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. His wife, Kasandra, alleges a claim for the expenses incurred in caring for her husband, loss of her husband's earnings and services, and loss of consortium. On September 11, 2013, Defendant removed the action to the Federal District Court for the Western District of Pennsylvania, invoking this Court's diversity-of-citizenship jurisdiction. This motion was filed following the close of discovery.

## II. Defendant's Motion to Exclude Opinion Testimony of Michael M. Ellis

### A. Legal Standard

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). Thus, whenever a party seeks to admit expert testimony at trial, the district court must make an initial preliminary determination "that the requirements of Fed. R. Evid. 702 have been met." *Magistrini v. One Hour Martinizing Dry Cleaning*, 68 F. App'x 356, 356 (3d Cir. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). Rule 702 has three requirements: (1) the proffered expert must be qualified; (2) the process or technique used in formulating the expert's opinions must be reliable; "and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244 (citing *Kannankeril*, 128 F.3d at 806). When considering these requirements, the district court must be mindful that "'Rule 702 . . . has a liberal policy of admissibility.'" *Id.* (quoting *Kannankeril*, 128 F.3d at 806).

### B. Discussion

In moving to preclude Plaintiffs' expert witness, Michael M. Ellis ("Ellis"), from

testifying, Defendant argues that Ellis is not qualified and that his methodology is not reliable. Defendant also argues that the opinions of Ellis do not fit the facts of this case. The Court will address each of these arguments in turn.

### 1.    Qualification Requirement

To begin, Defendant argues that Ellis is not qualified as an expert in grinding wheels. "At most," Defendant contends, "Mr. Ellis possesses the academic credentials to speak about engineering generally, but he lacks the requisite background in grinding wheels . . . to be qualified as an expert in this case." Def.'s Br. at 11, ECF No. 25. The Court cannot agree.

The Court of Appeals for the Third Circuit has "interpreted Rule 702's qualification requirement liberally." *Pineda*, 520 F.3d at 244 (citing *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). It has explained that "a 'broad range of knowledge, skills, and training'" can suffice to "'qualify an expert.'" *Id.* (quoting *Paoli*, 35 F.3d at 741). "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Paoli*, 35 F.3d at 741). The Court of Appeals has repeatedly "stated that 'it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" *Kannankeril*, 128 F.3d at 809 (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). Consistent with that principle, [n]umerous cases within our circuit have held that an expert opining on a general matter is not required to have experience that is narrowly tailored to the specific industry in question." *Geis v. Tricam Indus., Inc.*, No. CIV.A. 09-1396 MLC, 2010 WL 8591142, at *7 (D.N.J. Oct. 6, 2010) (citing *Kannankeril*, 128 F.3d at 809; *Holbrook*, 80 F.3d at

782; *Hammond v. Int'l Harvester Co.*, 691 F.2d 646 (3d Cir. 1982); *Smolow v. Hafer*, 513 F. Supp. 2d 418, 425–28 (E.D. Pa. June 25, 2007); *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510 (E.D. Pa. 2001)).

In light of this flexible standard, the Court finds that Ellis is qualified to offer expert testimony as to why the grinding wheel failed. While Ellis might lack experience working with grinding wheels, he does have extensive formal qualifications and a specialty in fracture mechanics and materials failure analysis. Specifically, he has a Master of Science Degree in Mechanical Engineering, a Master of Science Degree in Ceramics Engineering, and has nearly completed all of the requirements of a Ph.D. in Mechanical Engineering. For the past 20 years, he has also worked for Advanced Materials Engineer, Inc., a company that, among other things, performs failure analysis and provides manufacturing and support services for companies and government entities in the United States and abroad. Furthermore, Ellis' opinion is based on his expert knowledge of brittle materials. As he explains in his report, a grinding wheel such as the one at issue here consists of abrasive grains, a phenolic binder, a wetting agent, and some type of filler. As such, it is considered a brittle material. When any brittle material cracks, it behaves in a certain manner. Accordingly, Ellis' education, training, and experience in studying the manner in which brittle materials fail is "more than sufficient" to permit him to testify regarding the possible causes of the grinding wheel's failure. *Pineda*, 520 F.3d at 245; *see, e.g.*, *Tormenia v. First Investors Realty Co.*, 251 F.3d 128, 136 (3d Cir. 2000) (holding that the "District Court was certainly within its discretion to admit [an engineering expert's] testimony, notwithstanding the fact that most of [the expert's] experience in mechanical engineering concerned areas other than revolving doors . . .").

## 2. Reliability Requirement

Next, Defendant challenges the reliability of Ellis' methodology, contending that (1) his report "lacks any discernable method or testable hypothesis;" (2) was "not the subject of peer review and he cannot point to any peer reviewed literature to support his opinions or show his method is generally accepted;" and (3) "[t]oo great an analytical gap exists between [his] conclusions and the data relied upon[.]" Def.'s Br. 12-15. Plaintiffs respond that Ellis' methodology, which consisted of reviewing the "wheel jury report," the deposition testimony of the witnesses in this case, and photographs of the grinding wheel, is the "exact method" Defendant's own expert, George Reitmeyer, P.E., employed in rendering his opinions.[3] The two experts reviewed the same materials and "simply reached differing conclusions," and, in Plaintiffs' view, "[t]his is not a basis for exclusion of the evidence under the *Daubert* rule." Pls.' Resp. at 27, ECF No. 34.

"'[A]n expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" *Pineda*, 520 F.3d at 247 (quoting *Paoli*, 35 F.3d at 742). "[A] litigant has to make more than a prima facie showing that his expert's methodology is reliable," but the standard "'of reliability is lower than the merits standard of correctness.'" *Id.* (quoting *Paoli*, 35 F.3d at 744).

The Court of Appeals has identified several factors district courts should consider "in evaluating whether a particular methodology is reliable":

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the

---

3.     Reitmeyer opined in his report that the grinding wheel failed because of "mishandling impact damage which resulted in a radial crack in the rim of the cup that led up to complete failure when the wheel was brought up to machine speed." Def.'s Expert Report, ECF No. 29-5. According to Reitmeyer's deposition testimony, he based this conclusion "[o]nly on [his] own experience in examining grinding cup wheels." Reitmeyer Dep. at 91, ECF No. 35-7.

existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* (citing *Paoli*, 35 F.3d at 742 n.8). However, these factors "'are neither exhaustive nor applicable in every case.'" *Id.* (quoting *Kannankeril*, 128 F.3d at 806-07). Whether they are relevant "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). This is an inherently "flexible" inquiry. *Pineda*, 520 F.3d at 247 (quoting *Daubert*, 509 U.S. at 594). The question "is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999). The goal is simply "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Therefore, the focus must remain "on principles and methodology, not on the conclusions generated by the principles and methodology." 193 F.3d at 665 (citing *Kannankeril*, 128 F.3d at 806). "'The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.'" *Id.* (quoting *Kannankeril*, 128 F.3d at 806).

Even so, "'conclusions and methodology are not entirely distinct from one another.'" *Id.* (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). On the contrary, when assessing reliability, an expert's conclusions must be examined to decide "'whether they could reliably flow from the facts known to the expert and the methodology used.'" *Id.* (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)). If there is a "'too great a gap between the data and the opinion proffered,'" the opinion should be excluded. *Id.* (quoting *Joiner*, 522 U.S. at

519). The Court is thus not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

Against this analytical backdrop, the Court now turns to the expert testimony proffered by Plaintiff's expert, Ellis. In his report, Ellis opines:

> [t]he failure of the Norzon III Type 11 grinding cup in this case, in the manner described by the witnesses and as shown by the photographic evidence, would not have occurred in the absence of a manufacturing defect. There is no evidence that the grinding cup was dropped or was cracked before it was placed upon the grinder by Mr. Wilson. There is similarly no indication that the grinding cup "burst" due to excessive speed while on the grinder, because all witnesses agreed that the subject grinder would have been operating at less than ½ the rated speed (r.p.m.s.) for this grinding cup.
>
> The failure of the grinding cup occurred immediately upon contact with the work surface. The photographs of the subject cup indicate that the fracture initiated at the interface between the grinding material and the hardened steel bushing located at the center of the cup, and propagated outwards, lengthening and widening in a strait (*sic*) pattern, as a result of the rotational forces which occurred when the cup was applied by Mr. Wilson to the work surface. This fracture pattern is characteristic of a failure caused by a defect of the grinding cup, rather than breakage due to dropping, a pre-existent crack, or other external cause.

Pls.' Expert Report at 13, ECF No. 29-18.

He goes on to state that "it is no longer possible to conduct an engineering analysis or to state with scientific certainty the precise nature of the manufacturing defect in the product," on account of its destruction. *Id.* at 14. Nevertheless, he offers "three possible defects in manufacture which likely caused the subject failure," and opines, "with reasonable scientific certainty, that one of these defects caused the catastrophic failure of the grinding cup":

> (1). a defect of the phenolic resin during manufacture, resulting in excessive porosity at the interface with the hardened steel bushing; (2). defects in the wetting agent and/or filler utilized during manufacture, leading to defective bond between the grinding material and the bushing; or (3) micro-cracking and delamination of the material/bushing interface, resulting from post-manufacture re-tapping of the bushing due to defective, incomplete threads incorporated into the product at the time of manufacture.

*Id.* Of those three possible causes, Ellis concludes that:

> [t]he most probable cause . . . is post-manufacture "re-tapping" of the hardened steel bushing. A large but unknown number of defective, partially threaded bushings were incorporated into Saint-Gobain cup wheels sold to Mr. Wilson's employer, and Saint-Gobain permitted these defective grinding cups to be retained and corrected by the customer by "re-tapping" the threads. . . . This involves use of various tools to re-cut the threads of the bushing of the grinding cup. This practice is dangerous and inappropriate because of the high probability it will induce delamination or micro-cracking at the bore, which is exact condition which caused the failure of the grinding cup in this case.

*Id.*

The Court agrees with Defendant that Ellis' opinions do not pass must under Rule 702's reliability standard. In his report, Ellis spends several pages explaining purportedly relevant scientific and engineering literature and studies. The Court does not doubt that these principles and the disciplines of fracture mechanics and materials failure analysis, in general, are well-established. *See, e.g.*, *Fillebrown v. Steelcase, Inc.*, 63 F. App'x 54, 56-57 (3d Cir. 2003) (noting that "materials failure analysis" is a "well-established science[s]"). The Court also does not doubt Ellis' qualifications in these areas, as explained above. Ellis does not, however, explain how any of the materials he purports to rely upon or his own training and experience in these fields supports his conclusion with regard to the wheel at issue in this case – where the fracture originated or which direction it propagated. More to the point, he does not explain why this type of fracture pattern is indicative of a manufacturing defect and not something else or why a manufacturing defect would have to manifest itself in this manner. Nor does he explain how he ruled out other possible causes of the failure.

Likewise, although Plaintiff is correct that Pennsylvania law permits experts to opine about a variety of possible causes in cases such as this one where direct evidence of a defect is

unavailable,[4] under the Federal Rules of Evidence, such testimony must still be "rooted in something other than 'surmise, conjecture and speculation.'" *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 408 n.20 (D. Md. 2001) (discussing the tension between Maryland product liability law, which like Pennsylvania law permits "expert testimony as to the 'possible causes of accidents,'" and Fed. R. Evid. 702). Ellis' opinions as to the three "possible defects" are not. Essentially, he just picked each of the components of the grinding wheel – the phenolic resin, the wetting agent, and the filler – and opined that something must have gone wrong, without offering any support for his conclusion.

First, Ellis offered no basis for his opinion that the wheel's failure was caused by a defect in the phenolic resin. At his deposition, he testified, "I'm basing that [opinion] on scientific evidence and the investigation of phenolics, almost 100 years' worth of evidence on phenolics and various problems in phenolics." But he has not offered any explanation as to how that "evidence" is applicable in this case. Instead, in his report, he accuses Defendant of failing to perform "appropriate testing on the phenolic resins incorporated in the grinding wheel" either during the manufacturing process or while analyzing the subject wheel, and then jumps to the conclusion that "there is no scientific basis from which to conclude the subject product was properly manufactured and did not contain defects which led to its failure." Pls.' Expert Report at 10. That is not true, though. Defendant did, in fact, test the broken wheel to determine its density and composition, and it was found to be in accordance with its specifications. Ellis might take issue with the types of tests conducted, but that misses the point. In order to withstand scrutiny under *Daubert* and its progeny, he had to offer some basis from which to conclude that the wheel was defectively manufactured, and he failed to do so. Besides, Ellis did not actually

---

4.      *See infra* at 20-22 for a discussion of Pennsylvania's malfunction theory of product liability, pursuant to which expert testimony of this sort is allowed.

conduct any tests on the subject wheel, so, according to his own reasoning, he would have no scientific basis to conclude that the wheel was *improperly* made, just as he claims Defendant cannot conclude that the wheel was *properly* made.

Ellis' opinion as to a second possible defect – a defect in the wetting agent and/or filler – suffers from the same flaw. This opinion, like the first, is based on speculation, untethered from the facts of this case. Making matters worse, Ellis acknowledged at his deposition that to extent there was a defect with either of these two components of the wheel, it would have likely manifested itself in more than one grinding wheel. There is no evidence, however, that any of the other wheels manufactured by Defendant exhibited similar issues.

Ellis' opinion as to a third "possible defect" is more flawed yet. He opines that "post-manufacture 're-tapping' of the hardened steel bushing" is the most likely cause of the wheel's failure. The problem with this opinion is that although there is evidence that previous shipments of grinding wheels received by TMK had to be re-tapped because of issues with their bushings, there is no evidence that the subject wheel, or any other wheels in its lot, had been re-tapped. Ellis assumed that the bushing on the subject wheel had been re-tapped after looking at a photograph of the wheel – and what appears to be a grainy photo, at that. Indeed, when pressed during his deposition Ellis admitted that he could not tell for sure whether the bushing of the subject wheel had been re-tapped and that he had never actually seen a grinding wheel that had been re-tapped. Along those same lines, Ellis does not offer any explanation or support for his opinions that the practice of re-tapping is "dangerous and inappropriate" or that there is a "high probability" that it will cause "delamination or micro-cracking at the bore." Pls.' Expert Report at 14. Nowhere in his overview of the purportedly relevant scientific and engineering materials is there any discussion of the effects of re-tapping. Nor did Ellis test this hypothesis in any way,

although, it would seem, he easily could have by requesting a sample wheel from Defendant and attempting to mimic the effects of re-tapping in some manner. There is also no evidence that any of the wheels purchased by TMK that were, in fact, re-tapped exhibited any problems, which further undermines Ellis' assumption.

In short, the "analytical gap" between the facts on which Ellis purportedly relied "and the opinion proffered is too great and is connected only by the ipse dixit of the expert, not by any evidence" in the record. *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (excluding expert's opinion testimony, "which depended on the existence of a base lift jack," when there was no evidence that allegedly defective "longwall shield" was equipped with such a jack). It would thus be an abuse of discretion to admit this testimony. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record."). Contrary to Plaintiffs' argument, the fact that Defendant's own expert may have relied on the same techniques or methodologies does not change that result. As Defendant argues, Ellis' opinions – not Reitmeyer's opinions – are the focus of this motion. If Plaintiffs wished to challenge Reitmeyer's opinions and methodology, they could have filed a *Daubert* motion of their own.[5]

### 3. Fit Requirement

Defendant also disputes whether Ellis' testimony satisfies the third requirement of Rule 702. At this step, the Court must consider whether an expert's testimony fit the facts of the case, Such that that "it will aid the jury in resolving a factual dispute." *Lauria v. Amtrak*, 145 F.3d 593, 599 (3d Cir.1998) (quoting *Daubert*, 509 U.S. at 591). "[A]dmissibility depends, in part, on

---

5. The Court expresses no opinion as to whether Reitmeyer's opinions pass muster under Rule 702.

a connection between the expert opinion offered and the particular disputed factual issues in the case. *In re TMI Litig.*, 193 F.3d at 670 (3d Cir. 1999) (citation omitted). Therefore, "expert testimony based on assumptions lacking factual foundation in the record is properly excluded" under the fit requirement in addition to the reliability requirement. *Meadows*, 306 F. App'x at 790. Each of Ellis' opinions as to possible defects – but particularly his theory about re-tapping – depend on his own assumptions and lack a sufficient factual foundation in the record. Thus, in addition to failing to satisfy the reliability requirement, they do not "fit" the facts of this case and must be excluded.

### III. Defendant's Motion for Summary Judgment

#### A. Legal Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there are any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The nonmoving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Liberty Lobby*, 477 U.S. at 249). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

## B.    Discussion

Defendant moves for summary judgment on Wilson's strict product liability claim, arguing that he cannot rely on the malfunction theory, which Pennsylvania law has adopted for situations in which direct evidence of a defect is unavailable, because he is partially responsible for the destruction of the grinding wheel. In response, Wilson points the finger back at Defendant and contends that Defendant's destruction of the grinding wheel should give rise to a spoliation inference, thereby precluding the grant of summary judgment in Defendant's favor. Wilson also argues that Defendant's motion should be denied because he has established sufficient evidence to proceed under the malfunction theory, irrespective of whether or not they succeed in obtaining a spoliation instruction. The Court will first address Wilson's spoliation claim and then turn to the issues related to the application of the malfunction theory in this case.

### 1.    Spoliation

"'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"[6] *Swindell Dressler Int'l Co. v. Travelers Cas. and Sur. Co.*, 827 F. Supp. 2d 498, 505 (W.D. Pa. 2011) (quoting *Victor v. Lawler*, C.A. No. 3:08–cv–1374, 2011 WL 4753527, *1 (M.D. Pa. Oct. 7, 2011)). The court may impose a spoliation sanction against a party whenever: (1) the evidence was in the party's control, (2) the evidence is relevant, (3) there was "actual suppression or withholding of the evidence," and (4) "the duty to preserve the evidence was

---

6.       The parties appear to have assumed that federal law governs the imposition of spoliation sanctions in a diversity action. The Third Circuit Court of Appeals has not addressed whether their assumption is sound, but the Courts of Appeals that have addressed this question are seemingly in agreement that federal law applies. *See Sherman v. Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir. 2012) ("hold[ing], in accordance with our sister circuits, that federal law applies to the imposition of sanctions for the spoliation of evidence"). Consistent with this persuasive authority, this Court will apply federal law to the parties' spoliation claims.

reasonably foreseeable to the party." *Bull v. UPS, Inc.*, 665 F.3d 68, 79 (3d Cir. 2012) (citing

*Brewer v. Quaker St. Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)). The party seeking a

spoliation sanction bears the burden of proof as to each of these requirements. *Swindell*, 827 F.

Supp. 2d at 505. If the court finds spoliation, it must go on to consider what, if any, sanction is

appropriate. *Bull*, 665 F.3d at 74 n.5. Available sanctions include "(1) dismissal of a claim or

granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse

inference, referred to as the spoliation inference; (4) fines; and (5) attorneys' fees and costs."

*Bozic v. City of Washington, Pa.*, 912 F. Supp. 2d 257, 273 (W.D. Pa. 2012)273 (citations

omitted). To determine the type of sanction to impose, the court must balance (1) the alleged

spoliator's degree of fault, (2) the amount of prejudice experienced by the opposing party, and

(3) whether a lesser sanction will suffice. *Bull*, 665 F.3d at 74 n.5 (citing *Schmid v. Milwaukee

Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)).

   Here, the first and second requirements are not in dispute. Defendant had control of the

grinding wheel, and the wheel was obviously relevant to the claims and defenses in this action.

The parties disagree, however, about whether the third and fourth requirements have been met.

That is, whether Defendant's conduct rose to the level of "actual suppression" and whether the

duty to preserve the wheel was foreseeable.

   In *Bull*, the Third Circuit Court of Appeals clarified the type of conduct that rises to the

level of sanctionable spoliation. As the Court of appeals explained, "'[n]o unfavorable inference

arises when the circumstances indicate that the document or article in question has been lost or

accidentally destroyed, or where the failure to produce it is otherwise properly accounted for.'"

*Id.* at 79 (quoting *Brewer*, 72 F.3d at 334). Instead, the Court of Appeals concluded, "a finding of

bad faith is pivotal to a spoliation determination." *Id.* In light of *Bull*, this Court has explained

that "destruction [of evidence] that occurs as a result of inadvertence, routine practice, or accident is not spoliation at all." *Bozic*, 912 F. Supp. at 269.

When judged against these standards, Wilson's spoliation claim fails. After the wheel was returned to Defendant's facility, tested, and submitted to the wheel jury, it was discarded in accordance with Defendant's retention policies, which precludes a finding of bad faith. *See id.* "[T]he lack of bad faith stems in part from the fact that the party controlling the evidence" – in this case, Defendant – "had no reason to believe that it would be required in litigation." *First Sr. Fin. Grp. LLC v. Watchdog*, No. 12-CV-1247, 2014 WL 1327584, at *7 (E.D. Pa. Apr. 3, 2014) (citations omitted). Determining whether a party had reason to believe that the evidence in question would be required in litigation is governed by a "'flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.'" *Bull*, 665 F.3d at 77-78 (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)). Here, as both Curran and Cindrich confirmed, there was never any discussion about an injury to Wilson. While Wilson was transported by ambulance from TMK's plant and it was generally known by his co-workers that he had been injured, there is nothing in the record to indicate that these facts were conveyed to Defendant. Consequently, from Defendant's perspective, there was nothing to suggest that the incident was "so immediately dramatic to create an objectively foreseeable likelihood of litigation." *Harrell v. Pathmark*, No. C.A. 14-5260, 2015 WL 803076, at *4 (E.D. Pa. Feb. 26, 2015) (finding that litigation was not reasonably foreseeable whenever there was no evidence defendant knew of extent of plaintiff's alleged injuries, plaintiff never threatened defendant with a lawsuit, and plaintiff never asked that the video recording of her slip and fall be preserved); *see also Rivera v. Nat'l Passenger R.R. Serv.*, 442 F. Supp. 2d 164, 170 (S.D.N.Y. 2006)

(concluding that defendant did not have a duty to preserve metal cap that allegedly caused plaintiff's injuries where "plaintiff had not yet commenced any legal action, nor had she put Amtrak on notice that she was likely to do so, nor had she made any request to examine the capping").

Wilson attempts to argue that there is "conflicting evidence" as to whether Defendant knew about Wilson's injury, but this effort is unavailing. First of all, in support of this argument, Wilson asserts that "Cindrich . . . testified that Curran <u>never</u> asked him whether anyone was injured, but Curran may have learned of the injury through his conversations with Plaintiff's co-workers." Pls.' Resp. at 13 (emphasis in original). However, this is a slight mischaracterization of Cindrich's testimony. Cindrich did not, as Plaintiffs suggest, say that Curran never asked him about whether anyone was injured. Instead, the portion of Cindrich's deposition upon which Wilson relies reads as follows:

> A.    [Curran] looked at the wheel, and we basically gave him information that we thought at the time that happened based on our investigation.
>                                 ***
> Q.    And to your knowledge, Mr. Curran then, because you just described an incident, he was not aware then of any ongoing [] or injury involved in this; is that right?
>
> A.    Not on the initial call. But when he came in, he was aware that there was an incident, because, sure, the guys were talking to him about it, the hourly guys. *But I didn't say: Hey, we had an injury with your product. I didn't say that to him.*
>
> Q.    You didn't say that to him?
>
> A.    No. We had an incident, but we weren't sure at that time if there was any injury at that time. We were still investigating it at that time.

Cindrich Dep. at 91-93, ECF No. 35-3 (emphasis added). When read in full, this testimony is actually consistent with Curran's testimony. No matter whether Curran specifically asked whether anyone was injured, both Cindrich and Curran testified that that there was no mention

that anyone had been injured. Second, Cindrich's testimony about whether the "hourly guys" told Curran about Wilson's injury is pure speculation. Cindrich admitted that he did not know whether any such conversations took place. *Id.* at 93 ("[Curran] . . . may have heard from them if there was an injury, sure. . . . I don't know."). As such, it is not sufficient to create a question of material fact about whether Defendant had a reason to know about Wilson's injury.

Wilson also argues that Cindrich discussed Wilson's injury with Jacobs, the representative from Huston Group. Here again, though, he never explains why the Court should impugn Jacobs' purported knowledge of the injury to Defendant. He is not employed by Defendant, and there is nothing in the record to suggest that he ever discussed the incident with any representatives of Defendant. So this, too, is insufficient to convince the Court that Defendant should have foreseen the likelihood of this litigation.

Perhaps Defendant should have kept the grinding wheel for a longer period of time, but the wisdom of its retention policies is not at issue. What is at issue is whether Defendant had some reason to know that a lawsuit was likely to be filed and then took steps to destroy the wheel in bad faith, i.e., with intent to prevent its use as evidence in this litigation or at least recklessness as to the consequences of its conduct. *See Bozic*, 912 F. Supp. 2d at 269. Such evidence is lacking, and therefore Wilson's request for a spoliation instruction must be denied.

### 2. Malfunction Theory

To establish a prima facie case of strict product liability, a plaintiff must prove "that the product was defective and that the product caused the plaintiff's injury." *Wiggins v. Synthes (U.S.A.)*, 29 A.3d 9, 14 (Pa. Super. Ct. 2011). Generally, a plaintiff relies on "direct evidence of an alleged defect in the product to establish the required elements[.]" *Barnish v. KWI Bldg. Co.*, 980 A.2d 535, 539 (Pa. 2009). But sometimes – say, whenever a product has been lost or

destroyed – a plaintiff cannot introduce direct evidence of a defect. *Rogers v. Johnson & Johnson Prod., Inc.*, 565 A.2d 751, 754 (Pa. 1989). In such cases, Pennsylvania law allows a plaintiff to resort to the malfunction theory, which does "nothing more" than allow a plaintiff to prove a defect through "circumstantial evidence of product malfunction" whenever the precise defect cannot be shown. *Id.* (citing *MacDougall v. Ford Motor Co.*, 257 A.2d 676, 680 (Pa. Super. Ct. 1969)). In that way, it is akin to res ipsa loquitur: "both are rules of evidence rather than distinct causes of action" that "allow the fact-finder to draw an inference that a defect existed in the product as originally sold." *1836 Callowhill St. v. Johnson Controls, Inc.*, 819 F. Supp. 460, 463 (E.D. Pa. 1993). To create such an inference, a plaintiff must introduce (1) "evidence of the occurrence of a malfunction," and (2) "evidence eliminating abnormal use or reasonable, secondary causes of the malfunction." *Rogers*, 565 A.2d at 754 (citations omitted).

As the Pennsylvania Supreme Court has explained, these "requirements correlate with the three elements of a standard [strict liability] claim." *Barnish*, 980 A.2d at 541. "For example, by presenting a case free of abnormal uses, such as using the product for an unintended purpose, the plaintiff can demonstrate that the product failed to perform as a reasonable customer would expect; thus, that it malfunctioned." *Id.* "Similarly, by presenting a case free of 'abnormal uses' by the plaintiff and free of 'other reasonable secondary causes,' a plaintiff can establish" an inference "that the alleged defect caused the injury (as opposed to another cause) and that the defect existed when it left the manufacturer's control (as opposed to developing after the product left the manufacturer's control)." *Id.* By contrast, if the plaintiff's case-in-chief reflects evidence "that the plaintiff was using the product in violation of the product directions and/or warnings . . . no reasonable jury could infer that an unspecified defect caused a malfunction when the more likely explanation is the abnormal use." *Id.* The same is true if "if the plaintiff's theory of the

case includes another cause for the malfunction such as improper maintenance or substantial wear and tear from regular use." *Id.* Importantly, "if the plaintiff presents a prima facie case free of abnormal use and secondary causes and the defense counters with a separate theory of causation, the case should go to the jury to resolve the question of fact." *Id.* at 542 (citing *Rogers*, 565 A.2d at 755.

"Establishing a prima facie case under a malfunction theory does not require a plaintiff to proffer expert testimony to prove how the product was defective or how the defect arose as a result of actions taken by the manufacturer or seller." *Walters ex rel. Walters v. Gen. Motors Corp.*, 209 F. Supp. 2d 481, 487 (W.D. Pa. 2002) (citing *Dansak*, 703 A.2d at 496). The Pennsylvania Supreme Court has instead identified various additional types of circumstantial evidence that may assist a plaintiff to establish a prima facie case under the malfunction theory:

> (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect.

*Barnish*, 980 A.2d at 542-43 (quoting *Dansak v. Cameron Coca-Cola Bottling, Co.*, 703 A.2d 489, 496 (Pa. Super. Ct. 1997) (citing Litvin & McHugh, Pennsylvania Torts: Law and Advocacy § 9.33 (1996))).

Notwithstanding the fact that Defendant destroyed the grinding wheel – thus making Wilson's reliance on the malfunction theory seem appropriate – Defendant argues that the theory is inapplicable because Wilson is at least "partially at fault" for the wheel's destruction. In effect, Defendant is making a spoliation argument of its own and argues that Wilson's alleged spoliation bars him from pursuing his claim. Defendant professes to find support for this argument in the Pennsylvania Superior Court's decision in *Dansak*, 703 A.2d at 489 and this Court's decision in

*Ellis v. Beemiller, Inc.*, 910 F. Supp. 2d 768 (W.D. Pa. 2012), which cites *Dansak*. Defendant's argument suffers from at least two fatal flaws.

First, Defendant assumes, based on a misreading – or selective reading – of *Dansak*, that summary judgment is the only available sanction for spoliation. When read closely, *Dansak* says no such thing. Defendant's argument may have been correct years ago when Pennsylvania courts, applying the spoliation doctrine, "consistently granted summary judgment to defendants when the plaintiff was in any way at fault for failing to preserve the defective product." *Dansak*, 703 A.2d at 493 (collecting cases). But that *per se* approach has since been abandoned, as the *Dansak* Court itself recognized – just two paragraphs above the quote Defendant relies upon – when it said that "no controlling Pennsylvania authority *mandates* summary judgment whenever the plaintiff fails to preserve the defective product." *Id.* at 495 (emphasis in original). In the immediate wake of *Dansak*, the Pennsylvania Superior Court twice confirmed that there is no "*per se* rule barring a plaintiff . . . from proceeding where the plaintiff fails to preserve the allegedly defective product," *Smitley v. Holiday Rambler Corp.*, 707 A.2d 520, 526 (Pa. Super. Ct. 1998), and that "summary judgment is not mandatory simply because the plaintiff bears some degree of fault for the failure to preserve the product," *Tenaglia v. Proctor & Gamble, Inc.*, 737 A.2d 306, 308 (Pa. Super. Ct. 1999). More recently, the Superior Court reiterated this very same principle in *Creazzo v. Medtronic* 903 A.2d 24, 29 (Pa. Super. Ct. 2006).

In place of a *per se* rule, the Pennsylvania courts have adopted the Third Circuit's approach to spoliation sanctions, outlined in *Schmid*, 13 F.3d at 79, which makes the award of summary judgment against an alleged spoliator a measure of last resort. *See Smitley*, 707 A.2d at 527 ("conclud[ing] that *Schmid* . . . sets forth the proper considerations for the spoliation doctrine in Pennsylvania"). Under this approach, "the plaintiff's degree of fault is indeed a major

component of whether severe sanctions such as dismissal are appropriate in a given case."
*Dansak*, 703 A.2d at 494. It is not, however, the only consideration; the other factors from
*Schmid* must also be taken into account. *Tenaglia*, 737 A.2d at 308. Thus, "where a plaintiff has
possession of the product summary judgment may be appropriate depending upon the degree of
prejudice to the defendant and whether a lesser sanction would protect the defendant's rights."
*Id.* at 308 n.1 (citations omitted). The "severity" of awarding summary judgment "makes it an
inappropriate remedy for all but the most egregious conduct." *Creazzo*, 903 A.2d at 29.

Not only does Defendant's argument wrongly assume that summary judgment is the only
available sanction for spoliation, but also, and more fundamentally, it puts the cart before the
horse by arguing that this Court should impose a spoliation sanction without first addressing
whether Wilson can even be held responsible for spoliation under the Third Circuit's test. As
previously noted, federal law applies to the imposition of sanctions for the spoliation of
evidence. *See supra* at 16 n.6. Thus, the Court must adhere to the same two-step process it
employed in analyzing Wilson's request for a spoliation instruction to determine whether to
grant Defendant's request for summary judgment. Under that approach, only if Defendant can
prove each of the three requirements from *Bull* and its predecessors would the Court need to
consider what type of sanction to impose, be it summary judgment or something less drastic,
with reference to the *Schmid* factors.

Having framed the issues in this manner, the Court must reject Defendant's spoliation
claim. Under Third Circuit precedent, a party can be responsible for spoliation only if the
evidence "was in the party's control" at the time of its loss or destruction. *Bull*, 665 F.3d at 73
(citing *Brewer*, 72 F.3d at 334). Wilson, however, did not have control over the grinding wheel
after the incident, and, in turn, could not have preserved it for this litigation. The wheel belonged

to TMK, and after the incident, it was removed from Wilson's workstation and returned to Defendant, which destroyed its remnants (albeit while still unaware of a personal injury to Wilson). At no point did Wilson even have the opportunity to inspect the wheel, such that he could have attempted to ensure its preservation. *Cf. Tenaglia*, 737 A.2d at 208 (finding that the plaintiff partially responsible for spoliation of defective cardboard box where "plaintiff inspected the box," "believed the box was defective," and "had the opportunity, and ability, to preserve the evidence by taking control or possession of the box before it was destroyed"). Consequently, Wilson cannot be held responsible for spoliation.[7]

Assuming, *arguendo*, that Wilson could be held partially responsible for the grinding wheel's destruction, the Court, balancing the factors from *Schmid*, 13 F.3d at 79, would still decline to award Defendant summary judgment as a sanction. First, Wilson's degree of culpability would be less than that of Defendant – the party that actually discarded the remnants of the wheel. Second, Defendant has not been unduly prejudiced by the wheel's unavailability. Granted, Defendant lacked the opportunity to have an expert inspect the grinding wheel with an eye toward this litigation or to rebut the claims of the Plaintiffs' expert. Nonetheless, it did have the opportunity to run tests on the wheel after it was returned from TMK and attempt to determine the cause of the wheel's failure, which it has relied upon in resisting Plaintiffs' claims. Further, while Defendant cannot introduce expert testimony based on physical tests of the actual grinding wheel, it remains free to "present evidence of its business practices and safety procedures, as well as expert and witness testimony, to establish that the product could not have

_____

7.    There is also no evidence of bad faith on Wilson's part, which is an additional reason why he cannot be found to have committed spoliation. *See Bull*, 665 F.3d at 79. It is not as though he knew that Defendant would almost immediately destroy the grinding wheel and intentionally waited to file suit until after that time to ensure that the wheel would be unavailable for inspection. Doing so would make no sense from Wilson's perspective since he is just as prejudiced as Defendant by the loss of the grinding wheel, if not more so.

been defective as alleged when it left [its] possession." *Dansak*, 703 A.2d at 494. By contrast, Wilson has not had any opportunities to inspect or test the wheel, and because Wilson bears the burden of proof, he is likely more prejudiced than Defendant by his "inability to present expert testimony based on tests" of the grinding wheel. *Id.* Therefore, the balance of equities weighs against granting Defendant's request for the drastic sanction of summary judgment.

The Court must still determine whether Wilson has adduced enough evidence to allow this case to proceed to trial under the malfunction theory. Recall that to establish a prima facie case under the malfunction theory, Wilson must introduce evidence (1) of a malfunction and (2) "evidence eliminating abnormal use or reasonable, secondary causes of the malfunction." *Rogers*, 565 A.2d at 754. With respect to the first element, there is sufficient evidence to conclude that the grinding wheel malfunctioned. The wheel failed as soon as Wilson touched it to the surface of the pipe. Thus, a jury could find that it did not "perform as a reasonable customer would expect[.]" *Barnish*, 980 A.2d at 542-43.

As for the second element, there is "evidence eliminating abnormal use . . . ." *Rogers*, 565 A.2d at 754. Wilson was using the wheel for its intended purpose, flash grinding, at the time of the incident. Further, although Defendant submits that there was tape on either the trigger or the safety of Wilson's grinder, and that this practice is somehow unsafe, the Court does not believe that this is enough to defeat Wilson's claim. First, during his deposition, Wilson disputed whether the grinder depicted in the photograph upon which Cindrich based his testimony even belonged to him. Plaintiffs also correctly point out that Cindrich did not testify that the trigger was taped down. Rather, he testified that there was tape on grinder, but the trigger, itself, was not taped. Cindrich Dep. at 41, 127, 131. Michael Haney's testimony also indicates that the trigger was not taped down. Only the safety switch was taped on the grinder in the photograph. Haney

Dep. at 17, ECF No. 29-11. Defendants suggest that this practice is also somehow unsafe, but the portions of Haney's deposition Defendant cites in support of that assertion say nothing about whether putting tape on the safety is considered safe. Nor is there any other evidence establishing a connection between putting tape on the safety and the wheel's failure. Accordingly, viewing the evidence in the light most favorable to Wilson, as must be done at this stage, the Court concludes that the evidence does not suggest that Wilson was using the wheel in violation of its "directions and/or warnings" or otherwise improperly. *See Barnish*, 980 A.2d at 542.

Wilson's evidence is also free of "reasonable secondary causes." *Rogers*, 565 A.2d at 754. In particular, the wheel had never been used before the incident, it broke as soon as it was touched to the pipe, and Wilson testified that he did not drop, bump, mishandle, or otherwise damage the wheel in any way. There is no evidence that anyone else did so, either. Rather, taken in the light most favorable to the Wilson, the evidence suggests that the wheel was properly stored and handled whenever it was in transit from Defendant's facility to Huston Group's facility and then on to TMK's plant. Accordingly, the Court concludes that Wilson has established sufficient circumstantial evidence to withstand Defendant's motion for summary judgment. Although Defendant has countered with an alternate theory of causation – that the wheel failed because of some type of "post-manufacture impact" – it will be up to the jury to decide which theory to believe. *See Dansak*, 703 A.2d at 498 ("Summary judgment is not warranted simply because the defendant hypothesizes (or even presents evidence of) reasonable secondary causes.").[8]

---

8. The Court notes that Defendant has not separately addressed Wilson's negligence and breach of warranty claims. Defendant does, however, state that "[b]ecause Plaintiff cannot prove a defect in the product, the other counts alleged in the Complaint . . . fail as a matter of law and summary judgment is appropriate." Def.'s Br. at 20 n.6. Like the strict product liability claim, however, the breach of warranty claim requires Wilson to show, *inter alia*, that the grinding

**IV.     Conclusion**

The Court recognizes the difficulty Plaintiffs' expert, Ellis, faced in offering an expert opinion in this case, inasmuch as he was unable to inspect or test the actual grinding wheel at issue. The reliability and fit requirements of Rule 702, however, are not lowered whenever a product has become unavailable. If anything, the court, in analyzing proffered testimony in such cases, should be even more vigilant to ensure that reliable expert testimony and not mere conjecture or guesswork is being put before the jury. Having engaged in that analysis in this case, the Court finds that Ellis' opinions do not satisfy the reliability or fit requirements. Defendant's motion to preclude Ellis from testifying will therefore be **GRANTED**. Nevertheless, the Court finds that Wilson has adduced sufficient circumstantial evidence to proceed on the malfunction theory of product liability. Accordingly, Defendant's motion for summary judgment will be **DENIED**. An appropriate order follows.

McVerry, S.J.

---

wheel was defective at the time it left Defendant's hands. *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992). Wilson can rely on the malfunction theory to prove the presence of the defect, and thus the breach of warranty claim will be allowed to survive. *See Progressive Cas. Ins. Co. v. Winnebago Indus., Inc.*, No. CIV.A. 08-343 ERIE, 2011 WL 1157182, at *2 (W.D. Pa. Mar. 29, 2011) (applying malfunction theory to breach of implied warranty claim). The Court is also constrained to allow the negligence claim to survive insofar as Defendant has not advanced any argument as to why judgment should be granted against Wilson on this claim.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **RYAN WILSON and KASANDRA WILSON,** *his wife,* | ) ) ) |
| **Plaintiffs,** | ) **2:13-cv-1326** |
| **v.** | ) ) |
| **SAINT-GOBAIN UNIVERSAL ABRASIVES, INC.,** | ) ) ) |
| **Defendant.** | ) ) |

## ORDER OF COURT

**AND NOW**, this 1st day of April, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that the MOTION TO EXCLUDE OPINION TESTIMONY OF MICHAEL M. ELLIS AND FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56 (ECF No. 24) filed by Saint-Gobain Universal Abrasives, Inc., is **GRANTED IN PART**, insofar as it seeks to exclude the proffered expert opinion testimony of Michael M. Ellis, and **DENIED IN PART**, insofar as it seeks an award of summary judgment.

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge

cc: **Edward J. Balzarini, Jr., Esquire**
Email: bw@balzariniandwatson.com
**Michael Balzarini, Esquire**
Email: mbalzar@consolidated.net

**Joseph S.D. Christof, II, Esquire**
Email: jchristof@dmclaw.com
**Christopher A. Lovato, Esquire**
Email: clovato@dmclaw.com